# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DAVID HAYES,
    *Plaintiff*,                    CASE NO. 4:14-CV-10686-LVP-PTM

*v.*

COMMISSIONER OF             DISTRICT JUDGE LINDA V. PARKER
SOCIAL SECURITY,           MAGISTRATE JUDGE PATRICIA T. MORRIS

        *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.      RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.      REPORT

### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Security Income ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff David Hayes was forty-four years old at the time of the administrative hearing on October 25, 2012. (Transcript, Doc. 6 at 23, 107.) Plaintiff worked for one year as a medical caregiver from 2008 to 2009, and for about a year in fast food management before his alleged disability onset. (Tr. at 143, 158.) Plaintiff filed his claim for DIB on June 30, 2011, and for SSI on October 6, 2011, alleging that he became unable to work on May 18, 2010.[2] (Tr. at 107-13, 116-21.) The claims were denied at the initial administrative stage. (Tr. at 54-55.) In denying Plaintiff's claims, the Commissioner considered discogenic and degenerative disorders of the back and carpal tunnel syndrome. (*Id*.) On October 25, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Andrew Sloss, who considered the application for benefits *de novo*. (Tr. at 23-37.) In a decision dated December 6, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 10-22.)

On December 13, 2013, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after review of additional exhibits,[3] (Tr. at 397-420), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-5.) On February 13, 2014, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.    Standard of Review

---

[2] The ALJ found that Plaintiff's alleged onset date was May 1, 2007. (Tr. at 15.)

[3] In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.    The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC")

assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides DIB to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI, 42 U.S.C. §§ 1381-1385, provides SSI to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.   The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claims and found at Step One that Plaintiff met the insured status requirements through March 31, 2010, and had not engaged in substantial gainful activity since May 1, 2007, the alleged onset date. (Tr. at 15.) The ALJ noted that Plaintiff had worked after this date but the work did not rise to the level of substantial gainful activity. (Tr. 15.) At Step Two, he found that Plaintiff's conditions of degenerative disc disease and carpal tunnel syndrome were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (*Id.*) At Step Three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 16-17.) At Step Four, he found that Plaintiff could perform light work with some limitations and was unable to perform any past relevant work. (Tr. at 17.) He also

found that Plaintiff was thirty-eight years old at the alleged onset date, putting him in the "younger individual" range of eighteen to forty-four years old. (Tr. at 17-18) At Step Five the ALJ found that there were jobs existing in the regional economy in significant numbers that Plaintiff could perform, and therefore found that Plaintiff was not disabled. (Tr. at 18-19.)

### E.   Administrative Record

### 1.   Medical History

Plaintiff was treated from February 14, 2006 to October 29, 2011, and from March 30 to October 10, 2012 at Genesee County Free Medical Clinic. (Tr. at 196-291, 301-05, 320-34.) The majority of these records are illegible.

A note from April 21, 2009 indicated a history of back pain from a motor vehicle accident two years prior, which was aggravated by movement. (Tr. at 226.) On May 4, 2010, Plaintiff complained of "throbbing pain in both hands with numbness up arms to shoulders." (Tr. at 215.) He was diagnosed with carpal tunnel syndrome and prescribed wrist splints. (*Id.*) On June 1, 2010 he complained of right hand numbness and pain, which seemed to have worsened despite his use of a wrist splint. (Tr. at 211.) He described the pain as throbbing with numbness in all the fingers except the pinky. (*Id.*) His grip was so weak that he could barely twist a cap off of a pop bottle. (*Id.*) A "c-spine x-ray [showed] mild scoliosis." (*Id.*) On November 19, 2010, a note indicated that Plaintiff had a history of carpal tunnel in his right hand. (Tr. at 206.) On March 30, 2011, Plaintiff refilled his pain medicine and complained of pain in the neck, lower back, and bilateral wrists. (Tr. at 205.) On May 24, 2011, there appears to have been a diagnosis of cervical spine spondylosis. (Tr. at 200.) On June 14, 2011, Plaintiff reported pain in his lumbar and cervical region that was worse at night. (Tr. at 198.) He was referred to a physical therapist and diagnosed with low back pain. (Tr. at 199.) On April 13,

2012, Plaintiff complained that all his joints were painful. (Tr. at 301.) He said his pain started about eight years ago after a motor vehicle accident. (*Id.*) On July 17, 2012 Plaintiff was referred to physical therapy. (Tr. at 320.)

On July 28, 2008, an x-ray of the lumbar spine showed "minimal spondylosis of the lumbar spine without evidence of fracture." (Tr. at 259.) On the same day, an x-ray of the thoracic spine was normal. (Tr. at 260.) A May 19, 2010 x-ray of Plaintiff's cervical spine showed "[m]ild scoliosis," but was "otherwise negative." (Tr. at 257.) An x-ray of Plaintiff's bilateral wrists from May 16, 2011 showed "very minor arthritic change scattered in the small joints of the hand and a couple of tiny bone cysts at the head of the proximal phalanges at the index and middle fingers which are not of significance." (Tr. at 255.) There was "no acute abnormality." (*Id.*) An x-ray of Plaintiff's spine from June 16, 2011 showed "[m]inimal early hypertrophic degenerative change anteriorly at L2 and L3." (Tr. at 254.)

On February 17, 2012, Plaintiff saw Dr. Clifford Buchman for an orthopedic consultative examination. (Tr. at 292-300.) Plaintiff reported a history of back and hand pain spanning the past one and a half years. (Tr. at 292.) He complained of pain and numbness in his hands. (*Id.*) He had received physical therapy for his back pain. (*Id.*) The pain was worse in his right hand—the numbness sometimes went all the way to his elbows and into all his fingers. (*Id.*) He also had burning sensation and sometimes would drop things. (*Id.*) He was using a splint on his right hand, which gave him some relief. (*Id.*) His symptoms were "aggravated by movement, gripping, grasping[,] or twisting." (*Id.*) He was currently living with his mother who was supporting him. (*Id.*) He could drive, he did not do housework or yardwork, and he was able to shower and dress independently. (Tr. at 293.)

Plaintiff was right-handed. (*Id.*) He could "pick up and manipulate coins with both hands." (*Id.*) He could "ambulate on heels and toes," his tandem gait was "satisfactory," and his straight leg raising seated was ninety degrees and supine was sixty degrees. (Tr. at 294.) Side bending was twenty degrees left and right, Patellar and Achilles reflexes were plus one, extension strength was "satisfactory," neurovascular status of feet was "satisfactory," Fabere-Patrick's was negative, and extensor strength was "satisfactory." (*Id.*) Examination of the elbows was negative, the range of motion was 0 to 140 degrees bilaterally, he had full supination and pronation, and Tinell's and Phalen's at the elbows were negative. (*Id.*) His wrists flexion and extension were both sixty degrees, sensation to pinprick was satisfactory, and Tinel's and Phalen's were "essentially negative" in the wrists. (*Id.*)

Dr. Buchman's concluded "Based on today's exam, my opinion is that Mr. Hayes is able to sit, stand[,] or walk a total of eight hours a day. He has no lifting restrictions. From a clinical standpoint, he is able to use his hands without restrictions." (*Id.*) He indicated with a checkmark that Plaintiff could among other things, sit, stand, push, tie shoes, dress and undress, dial a telephone, open door, make a fist, pick up coins and pencils, write, get on and off examining table, climb stairs; Plaintiff could not bend, stoop, carry, pull, button clothes, or squat and arise from squatting. (Tr. at 296.)

Plaintiff went to Michigan Sleep Specialists on May 1, 2012. (Tr. at 306.) He did not have obstructive sleep apnea, although there were occasional arousals because of respiratory disturbances. (*Id.*) Among other things, weight loss and avoiding sleeping supine were recommended. (*Id.*)

Plaintiff was treated at Family Care Plus Physical Therapy and Wellness from July 20 to October 10, 2012. (Tr. at 313-19.) Plaintiff reported overall twenty-five percent improvement

after his July 20 therapy session. (*Id.*) He was given recommendations on home exercises and he did his best to follow them. (*Id.*) His chief complaints were neck and low back pain; he had pain, stiffness, and weakness, which interfered with his activities of daily living. (*Id.*) He reported an onset of the symptoms around April 2010. (*Id.*) There was no swelling or deformity observed, tenderness was present upon palpation, his pain was a nine-out-of-ten, his neck range of motion was decreased fifty percent, his back range of motion was decreased fifty percent, his strength was within functional limits, and there was no neurological deficit present. (*Id.*) Plaintiff's gait was "[w]ithin functional limits." (*Id.*)

From July 3 to October 4, 2012, Plaintiff was treated by Dr. Mohammed Syed at Flushing Road Internal Medicine. (Tr. at 378-96.) Plaintiff wanted Dr. Syed to "assume his medical care." (Tr. at 383.) At the first visit he had a routine physical examination and denied joint pain and back pain; he was assessed with controlled hypertension, acute sinusitis, and obesity. (*Id.*) However, at the September 4 appointment, he complained of "pain in multiple joints[,] especially the right shoulder and right elbow." (Tr. at 378.) The pain was the worst when he first got up, but improved with movement. (*Id.*) Crepitus and mild clicking were noted in his joints; there was no erythema or heat noted. (*Id.*) Plaintiff also complained of pain in the right forearm, especially with movement. (Tr. at 380.) He denied "numbness, tingling[,] or changes in the skin color"; he also denied "any pain in the fingers, [and] forearm." (*Id.*)

On September 4, an x-ray of his right elbow indicated "[m]ild arthritis of the right acromioclavicular joint." (Tr. at 396.) On October 4, Plaintiff saw Dr. Syed complaining of among other things, "numbness associated with pain in the right hand and wrist." (Tr. at 394.) Repetitive motion made it worse. (*Id.*) Dr. Syed assessed him with carpal tunnel syndrome in his right hand. (Tr. at 395.) He was instructed to use a brace at night. (*Id.*)

9

## 2.      Function Reports

Plaintiff's mother completed a third-party function report on October 19, 2011. (Tr. at 148-57.) On a typical day, Plaintiff would come out of his room to use the restroom, eat meals, and take medications. (Tr. at 148.) He did not take care of anyone else's needs. (Tr. at 149.) Because of his injury he was no longer able to lift anything heavy, or stand or walk for more than a few minutes. (*Id.*) His condition kept him up most of the night with pain. (*Id.*) She did not know how his condition affected his ability to take care of his personal care needs. (*Id.*) He prepared his own meals which consisted of frozen dinners. (Tr. at 50.) He did not do housework or yardwork because it caused him pain in his hands and back. (Tr. at 49-50.) He went outside "[a] few times a month" to go to doctors. (Tr. at 50.) He would drive or ride in a car and he could go out alone. (Tr. at 151.) He had problems handling money because he had problems "[h]olding . . . small and large things." (Tr. at 152.) His hobbies used to include playing sports and visiting, but he has stopped now because of his condition. (*Id.*) He did not spend time with others or go out on a regular basis. (*Id.*) He sometimes had problems getting along with others because of lack of sleep. (Tr. at 153.) Plaintiff's mother indicated with a checkmark the following items that Plaintiff's condition affected: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, using hands, and getting along with others. (*Id.*) She estimated he could walk about twenty feet before needing to rest. (*Id.*) She said he did not finish what he started and that he has had problems with authority figures in the past and was fired [from KFC] because he "could not get alon[g] with the boss." (Tr. at 153-54.) He used wrist braces "all the time," but she was unsure if they were prescribed. (Tr. at 154.)

Plaintiff completed an adult function report on October 21, 2011. (Tr. at 170-73.) On a typical day, Plaintiff would wake up around 6:00 a.m. after going to sleep around 2:00 a.m. (Tr. at 174.) He would usually be in pain and eat something small in order to take his medicine. (*Id.*) If he was not going out he would spent most of his time on the couch "in and out of sleep." (*Id.*) He did not provide care for anyone else. (Tr. at 175.) Before his condition he was able to "sit or stand for long periods of time, [w]ork, sleep through the night . . . [,] climb a lot of stairs[,] use [his] hands for more than a few minutes without pain[,] [and] be in temperatures that are extreme hot or cold [sic]." (Tr. at 175.) His condition affected his sleep because his "back, knees, ankles, wrist, hands, all hurt at the same time," and his medicine did not ease the pain. (*Id.*) Dressing took Plaintiff a little longer and he "only dress[ed] as needed." (*Id.*) He took baths instead of showers in order to relax his body, he no longer cut his own hair, it hurt to hold a razor, he could feed himself although it took a little longer than before, and he could use the toilet but it was difficult for him to get up from a seated position. (*Id.*) He did not do any housework or yardwork because any movement would make his pain worse. (Tr. at 177.) Watching television was his only listed hobby. (Tr. at 178.) Plaintiff indicated with a checkmark that his condition affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair-climbing, completing tasks, concentration, using hands, and getting along with others. (Tr. at 179.) He could walk up the stairs before needing a rest. (*Id.*) Depending on his level of pain, he estimated he could only pay attention for about an hour. (*Id.*) He had been laid off from KFC, Burger King, Wendy's, Subway, and Arby's because of problems getting along with others. (Tr. at 180.) He did not handle stress or changes in routine very well. (*Id.*) He wore braces on both his wrists "all the time," which were prescribed in April 2011. (*Id.*)

### 3.      Plaintiff's Testimony at Administrative Hearing

At the administrative hearing, Plaintiff testified that after the alleged onset date of May 1, 2007 he had worked at Sand Point Enterprises in 2010 as a fast food manager-in-training. (Tr. at 26-27) He stopped working there because he was injured. (Tr. at 27.) In addition to the degenerative disc disease and carpal tunnel syndrome, Plaintiff was having problems with nerve pain in his neck. (*Id.*) He described it as a burning pain in his joints. (*Id.*) He also had pain in his middle and lower back since a 2004 car accident. (Tr. at 28.)

The carpal tunnel syndrome caused his hands to hurt: the joints ached, his hands would "lock up," and there would be "a burning sensation at [his] wrist and in [his] fingers." (*Id.*) He had not had any treatment or surgery for his hands. (*Id.*) He was wearing doctor-prescribed braces on his wrists at the hearing. (*Id.*) He wore them "all the time." (*Id.*) Sometimes his whole right arm would throb and then go numb. (Tr. at 32.) He did not think he could comfortably lift a gallon of milk. (*Id.*)

Plaintiff did not sleep very well. (Tr. at 29.) On a typical day he would be up most of the night and wake up around 7:00 a.m. and try to eat in order to safely take his medication. (*Id.*) Then he would try to do his therapy stretches. (*Id.*) He was not able to cook his own meals or do housework. (*Id.*) He was exhausted and in pain "all the time," which Plaintiff rated it as a seven out of ten. (Tr. at 29-30.) When Plaintiff engaged in activities like bending, lifting, or climbing stairs, his pain would flare up forcing him to rest or lay down. (Tr. at 30.) He could comfortably stand up for twenty or thirty minutes and could comfortably sit for about thirty minutes at a time. (Tr. at 31.) He could walk for about half a block. (*Id.*) Squatting and bending down caused pain and he had problems walking up stairs. (*Id.*)

### 4.      Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE"), Kimberly Warner, a series of hypothetical questions based on Plaintiff's age, education, and work experience. (Tr. at 33-37.) She defined the region as the State of Michigan. (Tr. at 34.) She classified Plaintiff's work as a caregiver as medium and semi-unskilled and his work as a fast food restaurant manager in training as light and unskilled. (Tr. at 35.)

The ALJ first asked whether a hypothetical individual who was "able to perform light work, except that he c[ould] only occasionally climb, balance, stoop, crouch, kneel[,] or crawl and [was] limited to frequent handling bilaterally" could perform Plaintiff's past work. (*Id.*) The VE testified that the first individual would not be able to perform Plaintiff's past work. (*Id.*) She said that there would be other work available, for example, a sorter (approximately 17,000 jobs regionally) and an inspector/hand packager (approximately 9000 jobs regionally) available. (Tr. at 35-36.) For the second hypothetical, the VE was to "assume that due to a combination of his medication conditions and associated pain[,] this person [was] unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week, for a 40 hour work week or an equivalent work schedule." (Tr. at 36.) The VE testified that the added limitation would preclude work at all exertional levels. (*Id.*) The VE's testimony was consistent with the Dictionary of Occupational Titles. (*Id.*)

Upon questioning by Plaintiff's attorney, the VE testified that a person who was off task more than twenty percent of the day or was absent more than one day per month would be precluded from working. (Tr. at 36.) She also testified that none of the above jobs would be available with a sit/stand/lie down option. (*Id.*) She did note that the above jobs would still be available, without reduction in numbers, with a sit/stand option. (*Id.*)

### F.    Governing Law and Analysis

13

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545.

### 1.     Legal Standard

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the RFC

> to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except that the claimant can occasionally climb, balance, stoop, crouch, kneel[,] or crawl and is limited to frequent handling bilaterally.

(Tr. at 17.) Light work

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claims. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.     Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d

at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.    *RFC and Hypothetical*

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

"Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only 'if the question accurately portrays [Plaintiff's] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

Plaintiff contends that "[b]ecause each element of the hypothetical does not accurately describe David Hayes in all significant, relevant respects, the VE's testimony at the hearing should not constitute substantial evidence. The ALJ did not properly evaluate all of David Hayes impairments in the hypothetical question." (Doc. 9 at 10.) Plaintiff then reiterates many of his symptoms, and then notes one impairment, "In terms of lifting . . . [Plaintiff] can lift less than a gallon of milk." (*Id.* at 11.) Plaintiff also complains

> Simply said the hypothetical the judge decided to follow was woefully inadequate and did not mirror David Hayes in every relevant aspect. The off task and lie down hypothetical much more adequately represents David Hayes in all relevant aspects and should have been followed. As such, the hypothetical the judge decided to follow[] should not constitute substantial and material evidence.

16

(Doc. 9 at 11.) This whole section amounts to an attack on the ALJ's RFC determination.

I suggest that substantial evidence supports the ALJ's RFC determination. Plaintiff did not meet his burden of showing that any additional impairments, such as a lay down option, belonged in the RFC. Plaintiff does not point to anything in the record to support his assertion that he would need to lay down during the day; nor does a review of the record support that contention. Further, Dr. Buchman opined that Plaintiff could "sit, stand[,] or walk a total of eight hours a day," that he had "no lifting restrictions," and that "he was able to use his hands without restrictions." (Tr. at 295-96.) Plaintiff does not, and after a review of the record I suggest cannot, point to any contrary opinion evidence.

### b.    Credibility Assessment, Medical Opinion Evidence, and Waiver

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-03p, 2006 WL 2329939, at *2. When "acceptable medical sources" issue these opinions, the regulations deem the statements to be "medical opinions." 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of these medical opinions, including any treating source opinions that have not been given controlling

weight. 20 C.F.R. § 404.1527(c). The ALJ should use the same analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Further, an ALJ must give a treating physician's opinions regarding the nature and severity of a claimant's impairments controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to the Commissioner are not "medical opinions" so they do not receive this deference. 20 C.F.R. § 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints is the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations also require an ALJ to provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

The regulations establish the following process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ evaluates symptoms by confirming, with medical signs and laboratory findings, that a medical impairment exists which "could reasonably be expected to produce the pain or other symptoms. 20 C.F.R. § 404.1529. The ALJ then determines whether that condition could reasonably be expected to produce the alleged symptoms or whether other objective evidence verifies the symptoms. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-

39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ determines the extent of work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While a claimant's description of symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), an ALJ may not disregard a claimant's subjective complaints about the severity and persistence of symptoms simply because substantiating objective evidence is lacking. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of confirming objective evidence regarding the severity and persistence of symptoms forces an ALJ to consider these factors:

> (i) . . . [D]aily activities; (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms; (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms; (vi) Any other measures . . . used to relieve . . . pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when

19

making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

When issues are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," they are deemed waived. *McPherson v. Kelsey*, 125 F. 3d 989, 995-96 (6th Cir. 1997). This district has found that when a party's brief is "completely devoid of any discernable legal argument" the plaintiff's motion should be denied since the only argument in it has been waived. *Burger v. Commissioner of Social Security*, No. 12-11763, 2013 WL 2285375 (E.D. Mich. May 23, 2013). "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones. *McPherson*, 125 F.3d at 995-96.

Plaintiff recites four pages worth of caselaw and regulations regarding the ALJ's credibility assessment and the weight accorded to treating source's and other medical opinions, but does not explain how these rules apply in Plaintiff's case. (Doc. 9 at 12-14.) Plaintiff does not point to any medical opinion or treating source opinion that the ALJ did not properly consider. Instead, he asserts

> [i]t is clear from the medical evidence of record that David Hayes testimony that his ability to engage in substantial gainful activity is severely limited as a result of his physical and mental conditions. As such, [he] would only be capable of engaging in substantial gainful activity only by enduring great pain and should, therefore, be found disabled in accordance with the Social Security Rules and Regulations.

> The reasons given by the ALJ in discounting David Hayes testimony are clearly insufficient, as argued above, and go against the rules, regulations and cases cited to above and, therefore, we would argue that the great weight of the evidence does support David Hayes testimony regarding his conditions and problems.

(Doc. 9 at 14.) He also asserts that "the Commissioner failed to satisfy this burden of proof [at Step Five] warranting reversal or remand. (*Id.* at 10.)

In this case I suggest that any potential arguments Plaintiff may have regarding the credibility assessment, medical opinion analysis, and treating source discussion, have been waived because he only cited the case law and regulations. With regard to credibility, only the first three paragraphs even mention credibility, and only by citing caselaw, not the present facts. Plaintiff does not point to any of his statements that the ALJ discredited, nor does he argue that the ALJ failed to properly explain his credibility assessment. Likewise, Plaintiff does not point to any treating physicians whose opinions improperly weighed—in fact there are no treating physicians. Further, the only opinion evidence in the record comes from Dr. Buchman, who considered Plaintiff capable of quite a lot. (*See* Tr. at 295-96.)

Further, I suggest that substantial evidence supports the ALJ's credibility assessment and the weight he accorded the opinion evidence. The ALJ noted that Plaintiff "testified to experiencing severe limitations, but the medical evidence contains no objective signs or findings to support" this testimony. (Tr. at 17.) He noted that "the signs and findings in the medical evidence of record reveal only mild degenerative changes and arthritis." (*Id.*) He also noted that Plaintiff "exhibited no signs of discomfort sitting for the entire hearing, and had no difficulty arising from his chair and exiting the hearing room." (*Id.*) The ALJ did note that the record revealed "an established physical therapy history for back and neck pain," so he therefore "utilized the above [RFC] giving claimant the benefit of all doubt." (*Id.*) He then found that "[a]fter careful consideration of the evidence . . . that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, . . . statements concerning the intensity, persistence[,] and limiting effects . . . are not

21

credible to the extent they are inconsistent" with the RFC. (*Id.*) Additionally, Plaintiff was sometimes inconsistent about his pain: On July 3, 2012, Plaintiff denied any joint or back pain. (Tr. at 383.)

Likewise, substantial evidence supports the weight the ALJ accorded to the opinion evidence. As mentioned above, the only opinion evidence came from Dr. Buchman. (Tr. at 292-300.) The ALJ noted that Dr. Buchman's "exam show[ed] no limitations and only minimal objective findings." (Tr. at 17.) The ALJ stated that he "considered the opinion evidence in accordance with the requirements of" 20 C.F.R. § 404.1527 and 416.927 and SSRs 96-2p, 96-5p and 06-3p. (Tr. at 17.) He did not state how much weight he actually gave Dr. Buchman's opinion, but he did assign Plaintiff an even more conservative RFC than Dr. Buchman's opinions would warrant, thus "giving claimant the benefit of the doubt." (Tr. at 17.)

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.    REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver

of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 27, 2015                                    /S Patricia T. Morris
                                                          Patricia T. Morris
                                                          United States Magistrate Judge